IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ROSE ANN CALLAHAN, | ) | Case No. 1:22-CV-01955 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff, Rose Ann Callahan, seeks judicial review of the final decision of the Commissioner of Social Security, denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act.  Although Callahan frames her brief as raising two main contentions, functionally, Callahan challenges the ALJ's negative findings, asserting that the ALJ erred: (i) in not finding her fibromyalgia and chronic pain syndrome were severe impairments, (ii) in not reviewing the opinions of Drs. Ng and Astley, and (iii) in evaluating her subjective symptom complaints. Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Callahan's applications for DIB and SSI be affirmed.

## I.    Procedural History

Callahan applied for DIB and SSI on October 29, 2019.  (Tr. 298-301).  Callahan alleged that she became disabled on December 31, 2018, due to: (i) severe depressive disorder,

(ii) migraines, (iii) neck pain, (iv) degeneration of intervertebral disc of cervical region, (v) chronic pain syndrome, (vi) insomnia, (vii) low back pain, (viii) left brachial plexitis, (ix) post-traumatic stress disorder ("PTSD"), and (x) fibromyalgia.  (Tr. 319, 326).  The Social Security Administration denied her claim initially and upon reconsideration.  (Tr. 84-98, 118-128).  Callahan requested an administrative hearing.  (Tr. 171-172).

On August 19, 2021, ALJ Traci Hixon heard Callahan's case telephonically and denied Callahan's applications in a September 15, 2021 decision.  (Tr. 14-35, 41-83).  The ALJ determined that Callahan had the residual functional capacity ("RFC") to perform light work, except that:

> [Callahan can] frequently push and/or pull with the left upper extremity; frequently climb ramps or stairs; occasionally climb ladders, ropes, or scaffolds; frequently balance, stoop, kneel, and crouch; occasionally crawl; frequently handle with the left upper extremity; occasionally left overhead reach; no exposure to extreme temperatures, concentrated vibration, unprotected heights, hazardous machinery, and commercial driving; perform simple, routine tasks with simple short instructions, make simple decisions; have occasional work place changes; no fast pace production quotas; [and] occasional interaction with the public.

(Tr. 23).

On August 17, 2022, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3).  On October 12, 2022, Callahan filed a complaint seeking judicial review.  ECF Doc. 1.[1]

## II.  Evidence

### A.  Personal, Educational, and Vocational Evidence

Callahan was born on July 18, 1981, and was 37 years old on the alleged onset date. (Tr. 329).  Callahan completed college in 2006 and had previously worked as a teacher and in retail.  (Tr. 320).

---

[1] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).

B.    **Relevant Medical Evidence**

Callahan focuses her challenge on the ALJ's consideration of the evidence of her subjective symptom complaints, specifically, her fibromyalgia, chronic pain syndrome, and migraines, as well as the medical opinion evidence; thus, it is unnecessary to summarize the medical and other evidence related to her other impairments.

In addition to the following treatment notes and medical evidence, Callahan provided documents recounting her history of medical appointments.  (Tr. 476-500, 2280-2378).  These records provided the date, care provider, and a brief description of what the visit was for, such as "MetroHealth Family Medicine Specialists" or "MetroHealth Parma Diagnostic Radiology." However, they provide no substantive information about what occurred during the appointment.

On January 15, 2019, Callahan saw Brendan Astley, M.D., for a left radio frequency ("RF") procedure on her left suprascapular nerve, which was uneventful.  (Tr. 1544-1545).

On January 18, 2019, Callahan saw Ranier Ng, D.O., for osteopathic manipulative medicine ("OMM") and treatment for her pain.  (Tr. 1529).  Callahan reported having prior RF procedures on her suprascapular nerve, which provided some relief, generally reducing her pain/discomfort from 10/10 to 6 to 8/10.  (Tr. 1530).  Callahan reported that her migraines were fewer and under control, noting she had not had one since her prior appointment in September 2018.  (Tr. 1530).  She also noted being able to function with her activities of daily living, losing her employment, and being able to meditate, attending a PTSD class, see a psychologist, and completing a chronic pain group.  *Id.*

As to her conditions, Callahan noted her neck was still tight, but she was doing her physical therapy exercises and doing aquatic therapy.  *Id.*  She also reported tightness in her mid-back and pain in her scapula when she turned her head to the left or crossed her left arm in front

of her body.  (Tr. 1531).  Dr. Ng also noted that Callahan reported having tightness in her left trapezius that was 8/10, burning, throbbing, and achy.  *Id.*  Her right trapezium was the same, but the left was more painful.  *Id.*  Callahan also rated her neck and back discomfort as 8/10, her lower back tightness as 6/10 with improvement from her weight loss, and 10/10 neck discomfort due to stress.  *Id.*  She noted using ice 1 to 2 times a day, and having relief with physical therapy. *Id.*  Dr. Ng noted that he had previously observed that Callahan's back pain was at the left upper back at ribs two and three, could radiate down the medial scapular boarder to her mid back and anteriorly; it had its onset about 10 to 15 years prior but Callahan had felt discomfort for 5 to 6 years.  *Id.*  Callahan generally described her pain as a burning sensation, that could be sharp, waxed and waned, would be exacerbated with prolonged periods of sitting, lifting, bending, or walking; and caused her trouble sleeping at night.  *Id.*

On physical examination, Dr. Ng noted tenderness at Callahan's left and right trapezius muscles, and "tissue texture changes," tenderness, restriction, and "spasm/increased muscle tone" across areas of her back and left arm.  (Tr. 1539).  Dr. Ng conducted OMM therapy, after which Callahan reported feeling better with less intense neck and upper back pain, reduced tightness and soreness in her mid and low back and having increased range of motion in her shoulders.  (Tr. 1539-1540).  Dr. Ng recommended that Callahan continue physical therapy, applying ice, using a TNS unit, and aquatic therapy.  (Tr. 1540).

On March 1, 2019, Callahan saw Dr. Ng.  (Tr. 1505).  Callahan continued to complain of tightness in her neck, back, and trapezius muscles; fewer and controlled migraines; and stress; but noted she continued to be able to function, meditate, do therapy, and attend various classes. (Tr. 1505-1506).  Dr. Ng's physical examination results and treatment were the same.

(Tr. 1514). Callahan reported improvement following the treatment, and Dr. Ng maintained his recommendations. (Tr. 1514-1515).

On March 19, 2019, Callahan saw Carlise Washington, APRN-CNP, for pain management of her left shoulder. (Tr. 838). Callahan reported that her pain had not changed since her prior appointment, and she described her left shoulder pain as burning, intermittent with radiation from her neck and left arm, and "made worse with everything." *Id.* Callahan indicated that her regimen was improving her ability to do her activities of daily living, was not causing adverse side effects, and was reducing her pain from a 10 to a 6/10. *Id.* Following her RF procedure in January 15, Callahan reported 65-75% improvement and that it had increased her quality of life. *Id.* A review of her systems was unremarkable. (Tr. 841). Callahan's physical examination was also, generally, unremarkable except her tenderness to palpation on her left cervical spine with negative spurling. (Tr. 841-842). Nurse Washington noted that Callahan was stable on her current medication regimen and her medications would be refilled. (Tr. 842).

On March 19, 2019, Callahan also saw Elizabeth Lee, M.D., for routine medical care. (Tr. 1497). Dr. Lee noted Callahan's prior history of depression, a deviated septum, migraines, and irregular menstruation. (Tr. 1497). A review of Callahan's systems and her physical examination results were unremarkable. (Tr. 1497, 1499). Dr. Lee provided routine care and instructed her to follow up in three months. (Tr. 1500).

On April 2, 2019, Callahan saw Dr. Ng. (Tr. 1475). Dr. Ng noted that Callahan was improving overall, her multiple medications were necessary to make her pain tolerable for therapy, her panic attacks had decreased, she was sleeping well and gaining weight, but she continued to have family stress and seek medical marijuana; Dr. Ng also noted Callahan had

obsessive and compulsive symptoms.  (Tr. 1475-1476).  In addition to discussing her mental health, Dr. Ng recounted that Callahan continued to report discomfort, although reduced, following her RF procedure, rating it as 8/10.  (Tr. 1476, 1478).  Callahan gave the following rating to her tightness/discomfort: (i) left trapezius 8/10; (ii) right trapezius 8/10; (iii) neck/mid back discomfort 10/10; lower back 7 to 8/10.  (Tr. 1478).  Callahan continued to report muscle tightness, fewer and controlled migraines, and stress; but she was able to function, meditate, was sleeping better, and did therapy.  *Id.*  Callahan noted her last treatment with Dr. Ng provided relief for two weeks.  *Id.*  Dr. Ng's examination was the same as prior appointments, and, following treatment, Callahan reported feeling reduced pain, stiffness, and tension. (Tr. 1486-1487).  Dr. Ng continued to recommend therapy and use of ice and a TNS device. (Tr. 1487).

On April 24, 2019, Callahan saw Dr. Astley for an RF procedure in her left shoulder, which she was noted to have tolerated well.  (Tr. 1464).

On May 7, 2019, Callahan saw Dr. Ng.  (Tr. 1453).  Callahan reported that her most recent RF procedure went well, and she had no burning sensation, but was tender and tight; her discomfort was still 8/10.  (Tr. 1454).  Her other reports regarding her tightness, discomfort, and stress remained largely the same.  *Id.*  She did note that she was having more frequent migraines. *Id.*  Dr. Ng's physical examination observations remained unchanged, and, following treatment, Callahan reported some reduction in tension and discomfort (from 9 to 10 to 6 to 7/10), and increased range of motion  (Tr. 1462-1463).

On June 18, 2019, Callahan saw Nurse Washington.  (Tr. 785).  Callahan's description of her left shoulder pain was the same as her prior visit, noting it was burning, intermittent with radiation from her neck and left arm, and was "made worse with everything."  (Tr. 786).  She

indicated her regimen allowed her to function and reduced her pain from an 8 to a 4/10.  *Id.*  A review of Callahan's systems and her physical examination results were, largely, unremarkable except for a notation that she had tenderness to palpation on her left cervical spine with "negative spurling." (Tr. 789-790).  Because Callahan's medication regime reduced her pain to an acceptable level, it was continued.  (Tr. 790).

On June 4, 2019, Callahan saw Dr. Ng.  (Tr. 1437).  Callahan's subjective complaints were largely the same, noting that she was still having more frequent migraines and following her April RF procedure she was still experiencing 8/10 discomfort; Callahan gave the following rating to her tightness/discomfort: (i) left trapezius 8/10; (ii) right trapezius 9-10/10; (iii) neck/mid back discomfort 8/10; and (iv) lower back 6/10.  (Tr. 1438).  She also noted she continued using ice twice a week and her last OMT treatment provided relief for two weeks.  *Id.*  Dr. Ng's physical examination observations remained unchanged, and, following treatment, Callahan reported some reduction in tension and discomfort (from 9-10 to 6 to 7/10).  (Tr. 1446-1447).  Dr. Ng's recommendations remained unchanged.  (Tr. 1447).

On June 18, 2019, Callahan saw Nurse Washington, reporting the same left shoulder pain.  (Tr. 1431).  Callahan reported that medication helped her ability to perform her daily living activities, but she had pain relief from 8 to 4/10.  *Id.*  A review of Callahan's systems and physical examination results remained unremarkable save for the same tenderness noted over her left cervical spine.  (Tr. 1433-1434).  Nurse Washington continued Callahan's medications.  (Tr. 1434).

On July 9, 2019, Callahan saw Dr. Ng for her left shoulder pain.  (Tr. 769).  Dr. Ng's assessment was that Callahan was stable on her current regimen, and the medication reduced her pain to an acceptable level that allowed her to function.  *Id.*  Callahan's complaints remained

largely the same as from her prior visits with Dr. Ng, but she noted she was having more frequent migraines.  (Tr. 770).  She also reported the following levels of tightness/discomfort: (i) left trapezius 8/10; (ii) right trapezius 9-10/10; (iii) neck/mid back discomfort 8/10; and (iv) lower back 8/10.  (Tr. 771).  She also noted she continued using ice twice a week and her last OMT treatment provided relief for two weeks.  *Id.*  Dr. Ng's examination was largely the same and, after treatment, Callahan reported a reduction in her pain, feeling less tense, and feeling less tightness in her muscles.  (Tr. 783-784).  Dr. Ng continued to recommend therapy, ice, and a TNS unit.  (Tr. 784).

On July 17 and 18, 2019, Callahan saw Dr. Astley.  (Tr. 658, 1413).  On July 17, Callahan underwent a RF procedure, which she tolerated well.  (Tr. 1413-1414).  The following day, Callahan returned to Dr. Astley, who noted that her medication reduced her pain to an acceptable level that permitted her to remain functional with her daily activities.  (Tr. 658). Callahan noted that she had experienced 75-80% improvement for three months following her April RF procedure and 65-75% improvement following the January procedure.  *Id.*  Callahan reported that her pain had gradually improved; she described the pain as sharp, burning, intermittent, with radiation into her left arm and worsening with movement.  *Id.*  She reported that medical marijuana helped with the pain reducing it from a 10 to a 6/10.  *Id.*  She also noted that her TNS unit helped.  *Id.*  A review of her systems was unremarkable, as was her physical examination.  (Tr. 659-660).  Dr. Astley assessed Callahan with left shoulder pain, general shoulder pain, suprascapular nerve entrapment, chronic pain syndrome, and lumbar spondylosis. (Tr. 660).  Treatment options, largely based on non-medication-based treatment options, were discussed and Callahan was scheduled for another RF procedure. (Tr. 660-661).

On August 6, 2019, Callahan saw Dr. Ng, and her complaints remained largely unchanged from her prior appointments.  (Tr. 730-732).  Callahan noted, however, that her migraines were more frequent, occurring 2-3 times a week, but she was still able to function.  (Tr. 732).  She also reported the following levels of tightness/discomfort: (i) left trapezius 8/10; (ii) right trapezius 8/10; (iii) neck/mid back discomfort 8/10; and (iv) lower back 8/10.  (Tr. 733).  She also noted she continued using ice twice a week and her last OMT treatment provided relief for two weeks.  *Id.*  Dr. Ng's physical examination was largely the same, and, following treatment, Callahan reported a reduction in pain, feeling less stressed, and feeling less tightness.  (Tr. 745-746).  Dr. Ng recommended she continued with physical therapy, ice, and a TNS unit.  (Tr. 747).

On September 4, 2019, Callahan saw neurologist Joseph Hanna, M.D., regarding her migraines.  (Tr. 724-726).  Callahan reported that she had chronic headaches, was never pain free, and had treated them with multiple medications, but was still experiencing over 20 headaches a month.  (Tr. 726).  A review of her systems was unremarkable, but Callahan reported that her pain was a 9 out of 10.  (Tr. 729).  Callahan's neurological examination appeared to be, generally, unremarkable.  *Id*.  Dr. Hanna's impression was that Callahan had chronic intractable migraines with chronic daily headaches.  (Tr. 730).  He adjusted her medication and instructed her to follow-up in 2 months.  *Id.*  Dr. Hanna diagnosed Callahan with chronic migraine without aura, intractable, without status migrainosus; other migraine without status migrainosus, not intractable; and migraine without status migrainosus, not intractable, unspecified migraine type.  *Id.*

On September 20, 2019, Callahan saw Dr. Ng, and reported bilateral joint pain across her ankles, knees, hips, hands/wrists, and in her back.  (Tr. 706).  She reported having whole body

pain, which made it difficult to walk and caused her to fall.  *Id.*  Callahan reported having

instances when her knees would also give out.  *Id.*  She noted that her August RF procedure

provided some relief, stating she only had a tightness sensation.  *Id.*  As to her migraines,

Callahan indicated she had them 2 to 3 times a week with stress, but she had some relief with a

TNS unit, and was still able to function, meditate, attend PTSD classes, and see a psychologist.

(Tr. 707).  She also reported the following levels of tightness/discomfort: (i) left trapezius 6/10;

(ii) right trapezius 8/10; (iii) mid back discomfort 10/10; and (iv) lower back 10/10.

(Tr. 707-708).  Dr. Ng's physical examination was largely the same, and, following treatment,

Callahan reported a reduction in pain, feeling less stressed, and feeling less tightness.

(Tr. 720-721).  Dr. Ng recommended she continued with physical therapy, ice, and a TNS unit.

(Tr. 721).

On September 30, 2019, Callahan also saw rheumatologist Stanley Ballou, M.D.,

regarding her fibromyalgia.  (Tr. 696).  At the top of the treatment note, it was written:

"**Diagnosis:** #1. Fibromyalgia."  (Tr. 698).  Callahan reported having diffuse pain in her bones

for the last 3 to 5 years, with it worsening over the past year.  *Id.*  She indicated the pain was not

only nerve pain, but muscle and joint pain as well.  *Id.*  Callahan indicated she would drop items,

had fallen because of decreased balance, had difficulty climbing stairs and walking considerable

distances.  *Id.*  Her worst pain was in her spine and in her knees, but it was greater in her right

than in her left.  *Id.*  Her pain also worsened in the afternoon and as the day went on.  *Id.*

Callahan noted that stress contributed to her pain and that medications had previously provide

some relief, but no longer did so.  *Id.*

Dr. Ballou observed that Callahan could ambulate without difficulty, could rise from a

chair unassisted, there was no joint swelling or tenderness in her hands, her grip strength was

normal, her wrists and elbows were asymptomatic, her shoulders had a full range of motion, her lumbar spine showed slightly diminished forward flexion and extension, her knees were cool without effusion, her ankles and feet were asymptomatic, and her proximal and distal muscle strength in her legs and arms were normal.  *Id.*  Dr. Ballou's impression was that "[h]er history and examination [were] consistent with fibromyalgia."  *Id.*

On October 7, 2019, Callahan saw Dr. Ng, and largely reiterated her complaints from their prior appointment.  (Tr. 664, 666-667).  She reported the following levels of tightness/discomfort: (i) left trapezius 6/10; (ii) right trapezius 8/10; (iii) mid back discomfort 10/10; and (iv) lower back 10/10.  (Tr. 667-668).  She noted having relief for about two weeks following her last appointment.  (Tr. 668).  Dr. Ng's physical examination was largely the same, and, following treatment, Callahan reported a reduction in pain, feeling less stressed, and feeling less tightness.  (Tr. 680-681).  Dr. Ng recommended she continued with physical and aquatic therapy, ice, and a TNS unit.  (Tr. 681).

On October 25, 2019, Callahan saw Dr. Astley, regarding her left shoulder pain. (Tr. 657, 1366).  Callahan reported continued shoulder, lumbar, and "sometimes FM" pain. (Tr. 657).  She also reported that her pain had been gradually improving, and she described it as sharp, burning, intermittent, with radiation to her left arm, and made worse with movement. (Tr. 1366).  She indicated that she used medical marijuana daily, which reduced her pain from a 10 to 6/10, and a TNS unit was also helpful.  *Id.*  A review of her system was unremarkable, as was her physical examination.  (Tr. 1367).  Dr. Astley adjusted her medication, recommended IV treatment, recommended pool therapy, and scheduled her for an RF procedure.  (Tr. 1367-1368). A few days later, Callahan underwent an RF procedure, which was uneventful.  (Tr. 1851).

On November 4, 2019, Callahan saw Dr. Ng, reporting her October RF procedure and that she had been in pain during October, but the procedure had provided some relief.  (Tr. 636, 641).  In addition to her continued complaints of joint and body pain, Callahan reported that she was having intermittent migraines.  (Tr. 641).  She reported the following levels of tightness/discomfort: (i) left trapezius 8/10; (ii) right trapezius 8/10; (iii) mid back discomfort 8/10; and (iv) lower back 10/10.  (Tr. 642).  She noted having relief for about two weeks following her last appointment.  *Id.*  Dr. Ng's physical examination was largely the same, and, following treatment, Callahan reported a reduction in pain, feeling less stressed, and feeling less tightness.  (Tr. 654-655).  In addition to his prior diagnoses of left shoulder pain, general shoulder pain, chronic pain syndrome, and lumbar spondylosis, Dr. Ng diagnosed Callahan with suprascapular nerve entrapment.  (Tr. 636)  Dr. Ng's recommendations regarding therapy and her medication remained the same.  (Tr. 363, 656).

On November 15, 2019, Callahan saw Dr. Astley for a nerve block procedure related to her spinal pain; the procedure went as planned.  (Tr. 1838).

On November 18 and December 2, 2019, Callahan saw Dr. Ng.  (Tr. 1827, 1872).  During her November visit, Callahan indicated her nerve block procedure provided relief, but her tightness and soreness remained.  (Tr. 1827).  Callahan also reported having intermittent migraines, being able to function with her activities of daily living, and using medical marijuana for her migraines of fibromyalgia.  *Id.*  During both visits, Callahan's reported pain complaints of tightness and soreness were, generally, consistent with her prior appointments.  (Tr. 1827-1828, 1872-1873).  Dr. Ng's examination and treatment remained generally the same.  (Tr. 1836-1837, 1885-1886).  And Callahan reported reduced pain/discomfort, increased range of motion, and

reduced soreness. (Tr. 1837, 1886). Dr. Ng's treatment recommendations remained the same. (Tr. 1837, 1886).

On December 4, 2019, Callahan saw Dr. Hanna, regarding her chronic migraines. (Tr. 1866). Callahan reported that she was still experiencing chronic headaches, was never pain free, experienced pain daily, some of her headaches were only on the right, she had greater than 20 headaches a month, and she treated them with multiple medications. (Tr. 1867). A review of her systems was unremarkable, except, on being asked to rate her pain, Callahan indicated it was 9/10, noting it was right hemicranial. (Tr. 1869). Dr. Hanna's observations on physical examination and on conducting a neurological examination were unremarkable. (Tr. 1870). Dr. Hanna's impression was that Callahan had chronic intractable migraines with chronic daily headaches with "med failure." *Id.*

On December 10, 2019 and January 6, 2020, Callahan again saw Dr. Ng. (Tr. 2116, 2135). Callahan reported continued pain and migraines consistent with her prior appointments with Dr. Ng. (Tr. 2117, 2135-2136). During her January appointment, however, she also noted that she was scheduled for a lidocaine infusion. (Tr. 2117). Dr. Ng's examination and treatment remained generally the same. (Tr. 2127, 2146). And Callahan reported reduced pain/discomfort, increased range of motion, and reduced soreness. *Id*. Dr. Ng's treatment recommendations remained the same. (Tr. 2128, 2147).

On January 21, 2020, Callahan was seen by Dr. Astley, and reported continued shoulder and lumbar pain that was gradually improving. (Tr. 2110). Callahan described her pain as sharp, dull, intermittent, chronic, without radiation, and made worse by flexion and rotation. *Id.* A review of her systems was unremarkable, and Dr. Astley gave her a lidocaine injection, which she tolerated well and "completely resol[ved] her symptoms." (Tr. 2112-2113). Dr. Astley's

13

observations on physical examination were unremarkable.  (Tr. 2113).  He encouraged Callahan to regularly exercise and provided a disability placard.  *Id.*

On January 27, 2020, Callahan saw Dr. Ng.  (Tr. 2097).  Callahan's reported complaints were generally the same as at her prior appointments, however, she noted that she was receiving another RF procedure in February, as well as another lidocaine infusion in April.  (Tr. 2098). Dr. Ng's physical examination results and treatment were largely the same as before, and Callahan reported a similar positive response to treatment as from their prior appointments. (Tr. 2108).  Dr. Ng's treatment recommendations remained the same.  (Tr. 2109).

On February 5, 2020, Callahan underwent a procedure for a suprascapular nerve block with Dr. Astley, which she tolerated well.  (Tr. 2096).

On February 17 and March 2, 2020, Callahan saw Dr. Ng.  (Tr. 2070, 2083).  Callahan's complaints were, generally, the same, but, in February, she indicated she was unsure whether her latest nerve block provided relief.  (Tr. 2070-2071, 2083-2084).  During her March appointment, Callahan reported her prior nerve block provided relief, her trigger point injections did not provide relief, and she currently felt like "crap" and that her whole back hurt, her body was achy, and her neck was tight.  (Tr. 2070).  Dr. Ng's observations on physical examination and treatment were the same, and Callahan indicated a similarly positive response to treatment. (Tr. 2080-2081, 2093-2094).

On March 4, 2020, Callahan saw Dr. Hanna for a neurology appointment regarding her migraines.  (Tr. 2066).  Callahan reported that she had chronic migraines, usually 4 times a week.  (Tr. 2067).  Dr. Hanna's notations following a review of Callahan's systems and physical examination were the same as their prior appointments, and his impression – that Callahan had intractable migraine headaches that were better with her current regimen – was, generally, the

14

same.  (Tr. 2069).  He provided her medication and instructed her to follow-up in three months. (Tr. 2069-2070).

On April 21, 2020, Callahan had a telephonic appointment with Dr. Astley; she reported that her shoulder pain had worsened, describing it as sharp, dull, intense, continuous, chronic, without radiation, and made worse by flexion.  (Tr. 2055).  A review of her systems was unremarkable.  (Tr. 2057).  Dr. Astley instructed Callahan to work on exercising to improve her strength and flexibility, prescribed her medication, and noted she was to have a nerve block procedure soon.  *Id.*

On May 20, 2020, Callahan saw Dr. Astley for a suprascapular nerve block; it was noted that Callahan tolerated the procedure well.  (Tr. 2040-2041).

On June 15, June 29, and July 6, 2020, Callahan saw Dr. Ng.  (Tr. 1976, 1989, 2002). During her June 15 appointment Callahan reported continued pain in her back and neck, as well as that her fibromyalgia was "acting up."  (Tr. 2003).  She also indicated that her recent suprascapular nerve block did not provide relief like before, and she had fewer migraines (down to once a week).  *Id.*  Otherwise, her complaints, including the ratings of her pain (with her shoulders and upper back being worse than her lower back), remained largely the same as her other appointments.  (*See* Tr. 1976, 1989-1990, 2002-2003).  Dr. Ng's observations on physical examination and treatment were the same, and Callahan indicated a similarly positive response to treatment.  (Tr. 1986-1987, 1999-2000, 2013-2014).  Dr. Ng's recommendations, likewise, remained unchanged.  (Tr. 1987, 2001, 2014).

On July 7, 2020, Callahan underwent an ultrasound of the soft tissue of her head and neck.  (Tr. 509).  The impression was that she had bilateral benign-appearing posterior neck lymph nodes measuring up to 3 mm in short axis.  *Id.*

On August 5, 2020, Callahan messaged Dr. Ng, indicating her migraines were "out of control," with her now having two migraines a day accompanied by intense pain, vision problems, coordination issues, and vomiting.  (Tr. 2275).  She had experienced this for about a week or more and noted that it had happened in the past.  *Id.*

On September 4, 2020, Callahan messaged Brendan Bauer, M.D., indicated that his had recently changed her medication for migraines, but noted that she had no relief and the week had been "hell on wheels."  (Tr. 2276).  She reported that increasing her other medication had also not helped and that she needed relief from the 2-3 migraines a day she was getting.  *Id.*

On October 17, 2020, Callahan underwent an MRI of her head.  (Tr. 516, *see also* Tr. 518-519).  The impression was that Callahan had a mild non-specific supratentorial white matter changes that could relate to sequela of chronic small vessel ischemia or migraines in view of the provided clinical history, but there were no acute intracranial findings.  *Id.*

### C.    Relevant Opinion Evidence

#### 1.    Letter – Brendan Astley, M.D.

On January 21, 2020, Dr. Astley prepared a letter identifying that Callahan was a patient of his.  (Tr. 2278).  He noted that she received "chronic pain therapy for the following diagnoses: Shoulder pain, unspecified chronicity, unspecified laterality, Lumbar spondylosis, Left shoulder pain, unspecified chronicity, Suprascauplar nerve entrapment, left and Chronic pain syndrome." *Id.*  He stated "[d]ue to Ms. Callahan['s] pain condition(s) as listed above, she may experience flair-ups, which can be debilitating and thereby making employment difficult."  *Id.*

#### 2.    Letter – Ranier Ng, D.O.

On January 19, 2021, Dr. Ng prepared a letter identifying Callahan as a patient. (Tr. 2279).  Dr. Ng wrote "[d]ue to her medical conditions of Chronic pain syndrome and

Fibromyalgia, she will experience flair-ups that prevents her from sustaining an employment/occupation at this time." *Id.*

### 3.    State Agency Consultants

On December 31, 2019, Rohini Mendonca, M.D. reviewed the medical evidence of Callahan's RFC.  (Tr. 107-110).  Dr. Mendonca concluded that Callahan was limited to occasionally lifting and/or carrying 50 pounds, frequently lifting and/or carrying 25 pounds; and standing, walking, or sitting 6 hours in an 8-hour work day.  (Tr. 107-108).  Dr. Mendonca also concluded that Callahan could frequently climb ramps/stairs, balance, stoop, kneel, and crouch; and could occasionally climb ladders, ropes, or scaffolds, and crawl.  (Tr. 108).  Dr. Mendonca further found that Callahan was limited in her ability to reach with her left arm overhead, but was otherwise unlimited.  (Tr. 108-109).  Lastly, Dr. Mendonca found that Callahan should avoid concentrated exposure to vibration and hazards.  (Tr. 109).  On August 7, 2020, David Knierim, M.D., reconsidered the medical evidence of Callahan's RFC; he, generally, affirmed Dr. Mendonca's findings, but concluded that Callahan's was limited to occasionally lifting and/or carrying 20 pounds and frequently lifting and/or carrying 10 pounds.  (Tr. 125-126).

### D.    Relevant Testimonial Evidence

Callahan testified at the administrative hearing.  (Tr. 45-71).  She indicated that she rarely prepared meals, washed dishes, or loaded the dishwasher, and she could not do laundry.  (Tr. 46).  Her former father-in-law, who lived with her, helped her do things.  *Id.*  She also had difficulty with her personal care, struggling to wash and brush her hair.  (Tr. 46-47).  She would shower about every couple of days.  (Tr. 76).  Callahan described her typical day as waking up, taking her medicines, getting cleaned up, and, generally, sitting on her bed thinking of the things she would like to do but could not because of her conditions.  (Tr. 48-49).  She would force herself to

go to her appointments, but would usually worry about what she would try to do or falling asleep because she only slept about three hours a night and slept in an upright position.  (Tr. 49-50). She noted she worried about what she would do and be in pain all day.  (Tr. 50).  She had a cat, which her former father-in-law helped her care for.  *Id.*  Callahan testified that she only left her home for appointments, noting that being in a car aggravated her PTSD to the point that she would get the shakes.  *Id.* She would sometimes text on her phone but rarely spoke on it because it stressed her out.  (Tr. 50-51).  She could use a computer but did not have one.  (Tr. 51, 76).

Callahan testified that she last worked for Kmart, doing a variety of things, usually in the front of the store.  (Tr. 52).  But she no longer remembered how to do the various roles she had for Kmart.  (Tr. 52-53).  At some point while working for Kmart, she was given an accommodation so that she did not lift more than 10 pounds and Kmart had accommodated her pain for years in various ways.  (Tr. 53-54).  She believed the number of her appointments a year would also make it difficult for her to work.  (Tr. 54).  Her position with Kmart, generally, required her to lift over 50 pounds and stand most of the day (although she took frequent breaks and would lean "the entire time").  (Tr. 57-58).  She also worked as a cashier for a candy company, where she had a stool, and as a teacher, where she could stand or sit.  (Tr. 58).  She had not had any hiring or firing authority at Kmart and did not think she would be able to do the work necessary to teach again.  (Tr. 69).  During a prior teaching job, while in college, other teachers had reprimanded her for errors she made in controlling the class.  (Tr. 70).

Callahan testified that she could not work because her "mind is a barrier," explaining that she would be so focused on her students' problems at home that she struggled to focus on her job.  (Tr. 59).  She also struggled with comprehension, feeling scattered.  (Tr. 60).  She indicated she received infusions for her physical ailments, as well as ablations and osteopathic

manipulations.  (Tr. 60-61).  Her pain was in her left shoulder and radiated down her back and neck.  (Tr. 61).  Her left shoulder muscle also had a burning sensation.  *Id.*  Between all her shoulder treatments, she thought her pain reduced by about 20 to 30 percent.  *Id.*  Callahan used a TNS unit, heating pad, and various massages at home to try to alleviate her pain.  (Tr. 62).  Her doctors had not recommended that she have any surgeries yet.  *Id.*  She had previously had surgery to remove bunions on her feet, but she still had pain in both and could not stand for long periods of time.  (Tr. 62-63).  Her nose would also run constantly in cold or wet environments.  (Tr. 63).  She continued having migraines, but she had just started a new treatment.  *Id.*  She used to get them 2 times a day, but now she was getting about 2 to 3 times a week and they would last anywhere from 1 hour to over 24 hours.  (Tr. 63-64, 72).  She thought her various medications caused her to have the shakes, affect her arm, caused her hair to fall out, diarrhea, and frequent urination.  (Tr. 64-65).

Callahan testified that she could lift about five pounds, she could stand a few minutes or walk a few steps before needing to sit down.  (Tr. 65).  She could sit for about 20 to 30 minutes before she needed to get up.  (Tr. 65-66).  She could use her left hand and arm for a short period of time until it started to hurt or burn with any movement hurt.  (Tr. 66).  She could go up and down stairs, but if there were a lot of stairs, she would have to stop in the middle.  (Tr. 66-67).  She could not get down on her knees, but she could crawl.  (Tr. 67).  Callahan also testified that she had difficulty being around other people and she could not follow a movie's plot.  (Tr. 67-68).  Because she was left-handed, her pain made her writing blurry.  (Tr. 70-71).  She'd had trouble with her writing for the past 6 to 8 months, and before that just had pain.  (Tr. 71).  The ablations provided about 30 to 40% relief from the burning sensation, and lasted only a week or two.  *Id.*

### III.    Law & Analysis

Before proceeding with the law, it is important to clarify what arguments Callahan is raising.  Callahan presents her brief as only raising two issues: (i) the ALJ's treatment of her subjective symptom complaints, and (ii) the ALJ's failure to evaluate Drs. Ng's and Astley's medical opinions.  *See* ECF Doc. 18.  But on review of her arguments, Callahan clearly intends to raise challenges to the ALJ's determinations at additional points during the sequential evaluation process and simply frames those challenge in terms of their influence on the ALJ's evaluation of her subjective symptom complaints.  For example, Callahan contends that the ALJ failed to consider the effect of her fibromyalgia in evaluating her subjective symptom complaints; but Callahan's discussion of the issue focuses almost exclusively on how the ALJ should have found her fibromyalgia to be a severe impairment.  Accordingly, my review of Callahan's claims will first look at her arguments at their respective steps in the sequential evaluation process and then at their possible impact, if any, on the ALJ's evaluation of her subjective symptom complaints.

Additionally, Callahan used several pages of her reply brief to urge the court to conclude that MyChart records (Exhibit 10F, Tr. 2280 – 2379) – which identified the dates of Callahan's appointments, the provider and/or MetroHealth department involved – constituted "medical evidence" supporting her contention that the *number* of appointments Callahan had been required to attend would render work impossible.  *See* ECF Doc. 22 at 1-4.  However, this argument is fundamentally flawed.  A review of Callahan's opening brief reveals that Callahan did not make this argument; rather, she merely referred to these notes in her summary of the facts.  *See* ECF Doc. 18 at 8.  Under the court's initial order, the plaintiff's initial brief's summary of the facts "shall accurately recite the record in a neutral tone *without argument, coloring, or spin.*

*Arguments should be in the* Argument *section, not in the* Statement of Facts." ECF Doc. 13 at 4.

As such, Callahan provided no substantive legal argument on the issue in her opening brief; and

the argument will not be considered.  *See Farley v. Integron Nat'l Ins. Co.*, No. 17-10874, 2018

U.S. Dist. LEXIS 110768, at *15 n.3 (E.D. Mich. July 3, 2018) (finding that a party failed to

raise an issue by only addressing an argument in the fact section of its brief).  Moreover, to the

extent Callahan raises the argument in reply brief, it is waived.  *See Dotson v. Colvin*, No. 3:16-

00997, 2017 U.S. Dist. LEXIS 46523, at *19 (M.D. Tenn. Mar. 29, 2017) (collecting Sixth

Circuit cases finding arguments raised for the first time in reply waived).

### A.    Standard of Review

The court's review of the Commissioner's final decision denying disability benefits is

limited to deciding "whether the ALJ applied the correct legal standards and whether the findings

of the ALJ are supported by substantial evidence."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d

399, 405 (6th Cir. 2009).  Substantial evidence exists "if a reasonable mind might accept the

relevant evidence as adequate to support a conclusion," *id.* at 406 (internal quotation marks

omitted), even if a preponderance of the evidence might support the opposite conclusion.

*O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020).  However, the ALJ's

decision will not be upheld when the ALJ failed to apply proper legal standards and the legal

error prejudiced the claimant.  *Rabbers v. Comm'r SSA*, 582 F.3d 647, 654 (6th Cir. 2009).  Nor

will the court uphold a decision when the Commissioner's reasoning does "not build an accurate

and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp.2d

875, 877 (N.D. Ohio 2011) (internal quotation marks omitted).

### B.    Step Two: Medical Impairments

Callahan contends that the ALJ erred in two ways: first, by failing to articulate what criteria her fibromyalgia diagnosis failed to meet under SSR 12-2p and, thus, why the ALJ did not include it as a severe impairment; and second, by mentioning, but never discussing, her chronic pain syndrome.  ECF Doc. 18 at 15-17.  The Commissioner disagrees, noting that any lack of discussion of Callahan's chronic pain syndrome at Step Two, even if an error, would be harmless because the ALJ found other impairments that limited Callahan's physical and mental abilities.  ECF Doc. 20 at 15-17.  In her reply brief, Callahan contends that an "implicit" discussion of her chronic pain syndrome was insufficient to satisfy the regulations, and that the Commissioner has improperly attempted to import Step Two's analytical requirements into her argument under Step Five and should be rejected.  ECF Doc. 22 at 4-5.

At Step Two, a claimant has the burden to show that she has *at least one* "severe impairment."  20 C.F.R. § 404.1520(a)(4)(ii), (c).  A "severe impairment" is a medical condition that has more than minimal effect on mental or physical function and is expected to last for 12 months or cause death.  20 C.F.R. §§ 404.1509, 404.1522; *Salmi v. Sec'y of Health & Human Servs.*, 744 F.2d 685, 691 (6th Cir. 1985).  This is a threshold inquiry "intended to 'screen out totally groundless claims.'"  *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576 (6th Cir. 2009) (quoting *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985)).  If the claimant doesn't show she has *at least one* "severe" impairment, she's categorically *not* disabled.  20 C.F.R. § 404.1520(c).  If she does satisfy this minimal burden, the ALJ has to consider *all of her impairments* (even ones that aren't "severe") at the remaining steps in the sequential evaluation.  *Nejat*, 359 F. App'x at 577 (quoting SSR 96-8p, 1996 SSR LEXIS 5 (Jul. 2, 1996)).  And, so long as the ALJ considers all the claimant's impairments in the other steps, any Step

Two error is harmless. *Nejat*, 359 F. App'x at 577 (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)).

### 1. Fibromyalgia

Social Security Ruling 12-2p provides guidance on how the agency determines whether fibromyalgia is a medically determinable impairment. *Luukkonen v. Comm'r of Soc. Sec.*, 653 F. App'x 393, 398 (6th Cir. 2016). Under that ruling, a claimant has a medically determinable impairment of fibromyalgia if: (i) a physician diagnosed the claimant with fibromyalgia after a physical exam and review of her medical history; (ii) the diagnosing physician presents evidence that satisfies the Section II.A or Section II.B criteria; and (iii) the physician's diagnosis is not inconsistent with other evidence in the record. SSR 12-2p, 2012 SSR LEXIS 1, at *3-4.

Sections II.A. and II.B of SSR 12-2p establish two alternative sets of criteria for establishing fibromyalgia as a medically determinable impairment. *Id.* at *4. The Section II.A. criteria require: (i) a history of widespread pain; (ii) at least 11 positive tender points, which must be found bilaterally and above and below the waist; and (iii) evidence that other disorders that could cause the claimant's symptoms or fibromyalgia signs were excluded. *Id.* at *6-7. The Section II.B. criteria require: (i) a history of widespread pain; (ii) repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions; and (iii) evidence that other disorders that could cause those repeated manifestations were excluded. *Id.* at *7-9. Examples of fibromyalgia symptoms, signs, or co-occurring conditions including fatigue, cognitive or memory problems, waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome. *Id.* at *8.

The ALJ applied the correct legal standards and reached a decision supported by substantial evidence in finding that Callahan's fibromyalgia was not a medically determinable

impairment.  42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241

(6th Cir. 2007).  In making her Step Two findings, the ALJ stated:

> In order to find a medically determinable impairment of fibromyalgia, it must be diagnosed by a licensed physician who reviewed the claimant's medical history and conducted a physical exam.  The claimant must show a history of widespread pain in all four quadrants and axial skeletal pain for at least three months, excluding other disorders that could cause the symptoms.  In addition, the claimant must show eleven out of eighteen positive tender points on physical examination or repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occuring conditions.  Such findings were not documented in the medical record.  The rheumatologist who diagnosed the claimant with fibromyalgia had fairly cursory exam findings that do not meet the criteria of SSR 12-2p. (Exhibit 1F, page 132).  Therefore[,] the undersigned finds the claimant's fibromyalgia to be a non-medically determinable impairment.

(Tr. 20).  The ALJ accurately summarized the criteria for both Section II.A. ad Section II.B.  *Id.*

*cf.* SSR 12-2p, 2012 SSR LEXIS 1, at *3-4.  And the ALJ explained the basis for her findings in

sufficient terms to allow the court to follow that neither set of criteria were satisfied and that

Section II.A.'s criteria were specifically not satisfied because, although Callahan had a

fibromyalgia diagnosis, Dr. Ballou's physical examination findings were only cursory.

*Fleischer*, 774 F. Supp.2d at 877; (Tr. 16).

Callahan takes issue with this analysis because the ALJ did not identify which criteria the

medical evidence failed to satisfy.  But Callahan has not cited record evidence that demonstrates

that she did satisfy these criteria.  Nor has she contended that the ALJ should have been satisfied

with Dr. Ballou's findings.  As a result, her challenge is only to how well the ALJ *articulated* her

finding.  But I find no error in the ALJ's articulation of her finding, and an independent review

of the record does not reveal evidence that Callahan's condition met the regulatory criteria for

having fibromyalgia designated a medically determinable impairment.  Rather, substantial

evidence supported the ALJ's conclusion. Such evidence includes: (i) the lack of any physical

examination identifying positive trigger points, (ii) the lack of any evidence of rule-out

diagnoses, (iii) the lack of evidence of six or more fibromyalgia symptoms, signs, or co-occurring conditions, particularly fatigue, cognitive or memory problems, or waking unrefreshed, and (iv) Callahan's failure to report pain across all four quadrants of her body on any consistent basis (*Compare* Tr. 660, 666-668, 730-733, 770, 786, 838, 1454, 1478, 1438, 1530-1531, 1827-1828, 1872-1873, 1976, 1989-1990, 2083-2084, 2098, 2110, 2135-2136 *with* Tr. 641-642, 657, 698, 706, 2002-2003, 2070-2071). SSR 12-2p, 2012 SSR LEXIS 1, at *6-7. Accordingly, the ALJ applied the correct legal standard and reached a decision supported by substantial evidence in determining that Callahan had not shown that her fibromyalgia should be considered a medically determinable impairment.

## 2. Chronic Pain Syndrome

As noted above, plaintiff bears the burden at Step Two of proving she suffers from an impairment that significantly limits her ability to perform basic work activities *See Harley v. Comm'r of Social Sec.*, 485 F. App'x 802, 803 (6th Cir. 2012); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003); *see also* 20 C.F.R. § 404.1520(c) (an impairment is considered severe if that impairment "significantly limits your physical or mental ability to do basic work activities."). "A diagnosis alone does not speak to the condition's severity or whether it is disabling." *Keele v. Berryhill¸* 2017 U.S. Dist. LEXIS 207052, at *10 (E.D. Tenn. Dec. 18, 2017). The ALJ's analysis of a claimant's impairments at Step Two informs the subsequent determination of the claimant's RFC, because the RFC describes "the claimant's residual abilities or what a claimant can do, not what maladies a claimant suffers from – though the maladies will certainly inform the ALJ's conclusion about the claimant's abilities." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 240 (6th Cir. 2002). In conducting the analysis, the ALJ need not discuss every piece of evidence in the record. *See Kornecky v. Comm'r of Soc. Sec.*,

167 F. App'x 496, 508 (6th Cir. 2006).  But the ALJ must consider all of the claimant's medically determinable impairments in determining her RFC.  *See Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 190 (6th Cir. 2009).

Preliminarily, it is worth noting that Callahan resists the interpretation of her own brief as raising her chronic pain syndrome argument under Step Two, arguing that it is a part of her Step Five contentions.  ECF Doc. 22 at 4-5.  I find this problematic for two reasons.  First, subjective symptoms complaint evaluations take place at Step Four of the sequential evaluation process, not Step Five.  Second, Callahan repeated her references to her fibromyalgia argument (raised under Step Two) in relation to the ALJ's treatment of her chronic pain syndrome.  *See* ECF Doc. 18 at 16-17.  As a result, the way Callahan has raised her contentions makes it appear that she is challenging the ALJ's failure to find Callahan's chronic pain syndrome to be a medically determinable impairment and for failing to consider it generally.  Accordingly, I will discuss how the issue would be assessed at both Step Two and Step Four.

Here, unlike Callahan's fibromyalgia, the ALJ did not specifically reference Callahan's chronic pain syndrome at Step Four but did discuss her allegations of body aches and pain. (Tr. 23-29).  So long as the ALJ adequately considered Callahan's chronic pain syndrome at some point in the decision, any failure to address it specifically at Step Two would not create a basis for remand.  *Nejat*, 359 F. App'x at 577.  Here, the ALJ has made such a determination more difficult by never referring to Callahan's chronic pain syndrome outside of the medical summary at Step Four.  Although a closer call, I find that the ALJ's non-mention of the term "chronic pain syndrome" does not require remand, because the ALJ considered all of the medically determinable impairments together, including Callahan's chronic pain, neck and back problems.  *See Keele*, 2017 U.S. Dist. LEXIS 207052, at *15-16 (finding that, despite the ALJ's

failure to explicitly reference several conditions in determining the claimant's impairments under Step Two and the RFC under Step Four, the error was harmless due to the ALJ's extensive discussion of underlying and corresponding conditions, such as chronic pain and neck and back problems).

The ALJ stated that she gave "careful consideration to the entire record," (Tr. 16, 23), and "considered all symptoms and the extent to which these symptoms [could] reasonably be accepted as consistent with the objective medical evidence." (Tr. 23). Callahan rather flippantly characterizes this argument as the equivalent of the ALJ acting like someone's mother saying "because I said so." I disagree. The ALJ's decision provided much more discussion, analysis, and citation to the medical record than Callahan's accusation. Although barely addressed by the Commissioner, a review of the ALJ's discussion of the medical evidence reveals a sufficient consideration of Callahan's conditions. The ALJ summarized numerous treatment notes, related in detail Callahan's complaints regarding her chronic pain, her left shoulder issues, her claimed inability to function, as well as the things Callahan acknowledged she was still able to do. (*See* Tr. 26-27). The ALJ did not provide much analysis of Callahan's other pain complaints, but the ALJ cited to numerous treatment notes that recounted both Callahan's complaints and her physicians' observations and findings. *See e.g.*, *id. citing* (Tr. 658 (referencing "generalized body pain"), 686 (referencing complaints of generalized pain and treatment for chronic pain), 721 (referencing complaints of joint, back and "whole body" pain)). From these citations, it is apparent that the ALJ was aware of and considered Callahan's complaints of chronic pain and generalized body pain and, consequently, build a logical bridge between the evidence and her decision. *Fleischer*, 774 F. Supp.2d at 877. Thus, any error in failing to analyze chronic pain syndrome at Step Two was harmless error and does not warrant remand.

### C.      Step Four: Medical Opinions

Two paragraphs of Callahan's opening brief argue that the ALJ erred by summarily rejecting and failing to evaluate the opinions of treating physicians Dr. Astley and Dr. Ng.  She asserts that the physicians did not simply offer opinions on issues reserved to the Commissioner. ECF Doc. 18 at 15.  The Commissioner disagrees.  ECF Doc. 20 at 24-25.  Callahan did not address this claim in her reply brief.  *See* ECF Doc. 22.

At Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC after considering all the medical and other evidence in the record.  20 C.F.R. § 404.1520(e). In doing so, the ALJ is required to "articulate how [she] considered the medical opinions and prior administrative medical findings."  20 C.F.R. § 404.1520c(a).  Under the regulations, a medical opinion is defined as:

> Statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

20 C.F.R. § 404.1527(a)(1).  However, "[a] statement by a medical source that [a claimant is] 'disabled' or 'unable to work' does not mean that [the SSA] will determine that [a claimant is] disabled."  *See* 20 C.F.R. § 404.1527(d)(1); *see also Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).  Such findings are reserved for the Commissioner.  *See* 20 C.F.R. § 404.1527(d)(1).

The ALJ applied the correct legal standards in choosing to dismiss Drs. Ng and Astley's opinions, or harmlessly erred in doing so.  42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers*, 486 F.3d at 241.  Callahan contends that the letters provided by Drs. Ng and Astley constituted medical opinions, which provided sufficiently specific explanations of her limitations to warrant ALJ review and that the ALJ erred by dismissing them.  ECF Doc. 18 at 15.  I disagree.  First, the key statement in each doctor's "to whom it may concern" letter is nearly identical, even using the

same incorrect term ("flair"-ups):  "Due to Ms. Callahan pain condition(s) as listed above, she may experience flair-ups, which can be debilitating and thereby making employment difficult." (Dr. Astley, Tr. 2278).  "Due to her medical conditions of Chronic pain syndrome and Fibromyalgia, [Ms. Callahan] will experience flair-ups that prevent he from sustaining an employment/occupation at this time."  (Dr. Ng, Tr. 2279).  Neither statement constitutes an acceptable medical opinion for the ALJ's consideration.

Statements about whether a claimant is not able to work fall within those findings reserved for the Commissioner.  *See* 20 C.F.R. §§ 404.1527(d)(1), 416.927(d).  Callahan attempts to construe the letters as medical opinions to satisfy § 404.1527(a)(1), arguing that they provided specific explanation of her diagnoses and resulting limitations.  But neither doctor identifies any specific "impairment-related limitations or restrictions" with respect to Callahan's ability to perform the physical demands of work activities, such as sitting, standing, walking, lifting, carrying, etc.  Although both doctors identified diagnoses and stated that "flair-ups" were the cause of Callahan's inability to work, neither doctor identifies any specific aspect or diagnoses which would cause the flare-ups, which would satisfy the regulation's requirements that a medical opinion identify specific mental or physical restrictions.  *See* 20 C.F.R. § 404.1527(a)(1); (Tr. 2278-2279).  Rather, the generality of the letters' representations – essentially that Callahan could not work – only addresses the core issue reserved for the Commissioner.  *See* 20 C.F.R. § 404.1527(d)(1).

The Commissioner side-steps Callahan's arguments and asserts that the letters were not medical opinions at all and, thus, the ALJ did not err.  ECF Doc. 20 at 24-25.  Although related, this is not the precise reason the ALJ gave, nor a truly responsive argument rebutting Callahan's claim.  Nevertheless, the Commissioner is correct.  Drs. Ng and Astley's opinions likewise fail to

present medical opinions in the boarder sense in that they did not address specific functional

limitations from which Callahan may suffer due to her impairments.  20 C.F.R. § 404.1527(a)(1).

Consequently, even if the ALJ had erred by dismissing the letters for only addressing issues

reserved to the Commissioner, such an error would be harmless, because it is evident that the

letters do not address the numerous regulatory criteria to constitute medical opinions.  *See*

*Rabbers,* 582 F.3d at 655-56 (noting that the ALJ's failure to use an "adjudicatory tool" that does

not change the outcome of the decision is harmless.").  Accordingly, remand is not warranted

based on the ALJ's treatment of Drs. Ng and Astley's letters, and the contention does not

undermine the ALJ's subjective symptom complaint finding.

### D.      Step Four: Subjective Symptom Complaints

Callahan contends that the ALJ erred in evaluating her subjective symptoms complaints

by failing to consider the above arguments and their impact, as well as failing to consider her

migraines and substantial, productive work history.  ECF Doc. 18 at 13-19.  The Commissioner

disagrees.  ECF Doc. 20 at 14-24.  In her reply brief, Callahan contends that evidence the

Commissioner would have the court disregard (Exhibit 10F, Tr. 2289-2379) is relevant medical

evidence that supports her subjective complaints and largely reiterates her other arguments.  ECF

Doc. 22 at 1-9.

A claimant's subjective symptom complaints are among the evidence that an ALJ must

consider in assessing a claimant's RFC at Step Four.  *See* 20 C.F.R. §§ 404.1520(e), 416.920(e);

*Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989) ("Subjective complaints of pain or

other symptoms may support a claim of disability.").  Generally, an ALJ must explain whether

she finds the claimant's subjective complaints consistent with objective medical evidence and

other evidence in the record.  SSR 16-3p, 2016 SSR LEXIS 4 *15 (Oct. 25, 2017); *Felisky v.*

*Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) (The ALJ must clearly explain her reasons for

discounting subjective complaints). In conducting this analysis, the ALJ may consider several

factors, including claimant's efforts to alleviate her symptoms, whether any treatment was

effective, and any other factors concerning the claimant's functional limitations and restrictions.

SSR 16-3p, 2016 SSR LEXIS 4 *15-19; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also*

*Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ

properly considered a claimant's ability to perform day-to-day activities in determining whether

his testimony regarding his pain was credible). The regulations don't require the ALJ to discuss

each factor or each piece of evidence, but only to acknowledge the factors and discuss the

evidence that supports her decision. *See Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir.

2012) ("The ALJ is not required to discuss methodically each [factor], so long as he

acknowledged and examined those [factors] before discounting a claimant's subjective

complaints." (quotation omitted)); *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004)

("'[A]n ALJ is not required to discuss all the evidence submitted.'" (quoting *Craig v. Apfel*, 212

F.3d 433, 436 (8th Cir. 2000)).

     The ALJ applied the correct legal standards and reached a decision supported by

substantial evidence in finding Callahan's subjective symptom complaints not supported by the

medical evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers*, 486 F.3d at 241. Looking first to

the ALJ's evaluation of Callahan's subjective symptom complaints generally, the ALJ

acknowledged her obligations under SSR 16-3P in the review of Callahan's complaints. (Tr.

23). The ALJ also discussed Callahan's physical complaints and provided a review of the medial

evidence. (*See* Tr. 23-25). Following this, the ALJ made clear statement indicating that she

found that the medical evidence did not support Callahan's complaints. (Tr. 26-29, 32). The

ALJ did not signal her findings by using the buzzwords associated with subjective symptoms complaints, but reading the ALJ's analysis as a whole and with common sense, the ALJ clearly made those findings and articulated her reasons for rejecting Callahan's complaints.  *See Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2020) ("[The court] read[s] the ALJ's decision as a whole and with common sense.").

Callahan does not take issue with the ALJ's analysis of her subjective symptom complaints as a whole, but strongly disagrees with the ALJ's treatment of Callahan's: fibromyalgia, chronic pain syndrome, migraines, and work history.  As just discussed, Callahan also objects to the ALJ's dismissal of Drs. Ng's and Astley's opinions.  As noted, however, neither the ALJ's treatment of Callahan's fibromyalgia and chronic pain syndrome, nor her treatment of Drs. Ng's and Astley's opinions constituted errors; accordingly, neither undermines the ALJ's evaluation of Callahan's subjective symptom complaints.

As to Callahan's migraines, the ALJ thoroughly explained: (1) Callahan's complaints regarding her migraines; and (2) why the medical evidence did not support the intensity and frequency of those complaints, explaining that Callahan's reporting of her migraine's intensity and frequency were inconsistent and her email complaints about her migraines were not supported by correlating medical records.  (Tr. 32).  Callahan's argument boils down to the contention that because her migraines never completely resolved and fluctuated in intensity, the ALJ erred in rejecting her subjective symptoms complaints in that regard.  I find that Callahan's contentions impose too rigid a reading on the ALJ's decision.  The ALJ rejected Callahan's migraine-related complaints based on the inconsistencies in her *reporting of* the intensity and frequency of her migraines.  (Tr. 32).  This does not necessarily mean the ALJ rejected Callahan's assertion that her migraines intractable or that they fluctuated.  Rather, the ALJ found

that there was inconsistency between Callahan's complaints and what the medical evidence reported.  And she was inconsistent.

A review of the medical evidence demonstrates that Callahan's migraines did fluctuate in their intensity, (*compare* Tr. 732 *with* 1530).  However, Callahan did not consistently report her migraines to Nurse Washington (*see* Tr. 786, 838, 1431), or to Dr. Astley (*see* Tr. 658, 1366, 2055, 2110-2113).  And she consistently noted to Dr. Ng that medication made her pain tolerable so she could function (*see* Tr. 641, 667, 707, 732, 770, 1438, 1454, 1478, 1827, 1976, 1989, 2002, 2078, 2083, 2098, 2117, 2136).  As such, substantial evidence supports the ALJ's findings that Callahan inconsistently reported her migraines.  *See Blakley*, 581 F.3d at 406.  Because the ALJ did not err in finding an inconsistency in Callahan's reporting, the ALJ could not have erred in "failing" to evaluate Callahan's "off task" time due to the headaches.  *See* ECF Doc. 18 at 17.  Callahan's own acknowledgement that medication allowed her to function was inconsistent with her claim that her migraines were so severe that she could perform no work activities.

Moreover, to the extent Callahan seeks to incorporate a challenge to the ALJ's RFC within her larger subjective symptom complaint argument, her challenge likewise fails.  The ALJ provided a robust discussion of Callahan's migraine-related treatment notes and incorporated limitations in the RFC expressly because of her migraines.  (Tr. 28-29, 32).  Callahan's contention that it was "clear error" for the ALJ not to conclude that Callahan's migraines would result in her being off task for certain unspecified periods of time is, thus, without merit and nothing more than an attempt to have the court reweigh the migraine-related evidence; this we cannot do.  *See Jones*, 336 F.3d at 476 (holding that under the substantial evidence standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence); ECF Doc. 18 at 17.

33

Additionally, Callahan contends that the ALJ erred by failing to *explicitly* discuss her positive work history.  ECF Doc. 18 at 18.  Although Callahan is correct that the ALJ must consider a claimant's work history, the regulations do not require the ALJ to do so explicitly or in any formalistic fashion.  *See Renstrom*, 680 F.3d at 1067.  Here, the ALJ did discuss Callahan's prior work history, albeit without the acknowledgement that Callahan had a multi-decade productive work record.  (*See* Tr. 32).  Accordingly, Callahan's contention that the ALJ failed to discuss Callahan's work history is not a ground for remand.

Finally, it bears mention that the ALJ supported her finding as to Callahan's subjective symptom complaints with additional inconsistencies which Callahan has not expressly challenged.  For example, the ALJ also found that Callahan claimed her arm pain resulted in her being unable to write but she was able to complete a multi-page form by hand; Callahan alleged she stuttered but none of the treatment providers noted a stutter; treatment notes repeatedly indicated that Callahan walked with a normal gait and had normal strength throughout her body; and although Callahan reported being unable to leave the house except for appointments, she was noted to have left home to go to the library and the Animal Protective League.  (*See* Tr. 32).  Even if Callahan could disprove some of these findings, she has not addressed or complained about most of them.  And the negation of one or even a few of the ALJ's reasons for finding Callahan's subjective symptoms complaint to be inconsistent with the record does not negate all of them.  Nor does it eliminate the substantial evidence, as discussed above, the ALJ cited in support of her findings.

Contrary to Callahan's argument, the ALJ manifestly did not reject Callahan's subjective complaints or, specifically, her pain complaints, because there was no "objective" medical

evidence to back them up.  The ALJ made her findings by comparing what Callahan alleged to what the medical records showed – or did not show.

Accordingly, because Callahan's various proposed grounds for finding that the ALJ erred in the evaluation of her subjective symptom complaints have failed to demonstrate that the ALJ applied the incorrect legal standards or reached a decision unsupported by substantial evidence, I recommend that the ALJ's decision be affirmed.

## IV.    Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Callahan's applications for DIB and SSI be affirmed.

Dated: August 10, 2023

Thomas M. Parker
United States Magistrate Judge

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge.  Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C. § 636(b)(1); Local Rule 72.3(b).  Properly asserted objections shall be reviewed de novo by the assigned district judge.

\* \* \*

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation.  *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019).  Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).  Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary

to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 U.S. Dist. LEXIS 100383, at *6 (W.D. Ky. June 15, 2018) (quoting *Howard*).  The failure to assert specific objections may in rare cases be excused in the interest of justice.  *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).